IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

CRAIG R. MOSCHKE,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

No. C11-2024

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.    PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . .   2

III.   PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . .   3

IV.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
       A.   Moschke's Educational and Employment Background  . . . . . . . . . .   4
       B.   Administrative Hearing Testimony  . . . . . . . . . . . . . . . . . . . . .   4
            1.   Craig Moschke's Testimony . . . . . . . . . . . . . . . . . . . .   4
            2.   Vocational Expert Testimony . . . . . . . . . . . . . . . . . . .   5
       C.   Moschke's Medical History . . . . . . . . . . . . . . . . . . . . . . . .   6

V.     CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . .  15
       A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . .  15
       B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . .  18
            1.   The Opinions of Dr. Conditt and Dr. Fuelling . . . . . . . .  18
                 a.   Dr. Conditt's Opinion . . . . . . . . . . . . . . . . . . .  18
                 b.   Dr. Fuelling's Opinion . . . . . . . . . . . . . . . . . .  22
            2.   Incomplete Hypothetical Question  . . . . . . . . . . . . . . .  23
            3.   ALJ's Evaluation of Moschke's Symptoms . . . . . . . . . . .  24

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

VII.   ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Craig R. Moschke on June 6, 2011, requesting judicial review of the Social Security Commissioner's denial of his application for Title II disability and Title XVI Supplemental Security Income (SSI) benefits. Moschke requests the Court reverse the decision of the Social Security Commissioner (the Commissioner) and order the Commissioner to provide benefits. In the alternative, Moschke requests that the case be remanded for further proceedings.

## II.  PROCEDURAL BACKGROUND

On January 29, 2008, Moschke applied for both disability insurance benefits and SSI benefits. In his applications, he alleged an inability to work since March 15, 2007 due to multiple ailments: osteoarthritis of the knees and ankles, obesity, cognitive disorder, reading disorder, math disorder, disorder of written expression, and mood disorder. Moschke's applications were denied on May 8, 2008, then denied upon reconsideration on August 25, 2008. On September 25, 2008, Moschke requested an administrative hearing before an Administrative Law Judge (ALJ). The administrative hearing was held on November 9, 2009, presided over by ALJ Marilyn P. Hamilton. Moschke appeared via video conference with his attorney. Moschke and vocational expert Marian S. Jacobs testified at the hearing and Nancy Gibson was present as an observer. The ALJ denied Moschke's claim on January 16, 2010, finding that Moschke was not disabled and not entitled to disability insurance benefits or SSI benefits because he was capable of performing work that exists in the national economy in significant numbers. Moschke appealed the ALJ's decision and the Appeals Council denied his request for review on May 3, 2011. As a result, the Commissioner adopted the ALJ's January 16, 2010 decision as final.

On June 6, 2011, Moschke filed the instant action for judicial review. On June 29, 2011, the parties consented to proceed before a magistrate judge pursuant to the provisions

set forth in 28 U.S.C. § 636(c).  The Commissioner filed an answer on August 5, 2011. On September 15, 2011, Moschke filed a brief arguing the ALJ's decision that he is not disabled and that he could perform other existing work is not supported by substantial evidence on the record.  On December 15, 2011, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and requesting the Court affirm the ALJ's decision.  Moschke then filed a reply brief on January 10, 2012.

### III.  PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review.   42 U.S.C. § 405(g).   The Commissioner's final determination not to award SSI benefits following an administrative hearing is likewise subject to judicial review.  42 U.S.C. § 1383(c)(3).  42 U.S.C. § 405(g) grants the Court the power to "[e]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  *Id.*

The ALJ's decision will be affirmed if it is supported by "substantial evidence on the record as a whole."  *Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) (citing *Brown v. Barnhart*, 390 F. 3d 535, 538 (8th Cir. 2004)) (internal quotation omitted).  The standard of substantial evidence is "less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's finding."  *Id.* at 964 (quoting *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the ALJ met the "substantial evidence" standard in reaching its decision, the Court must consider all of the evidence presented to the ALJ without re-weighing the evidence.  *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).  The Court's review "extends beyond examining the record to find substantial evidence in support of the ALJ's decision," but also considers "evidence in the record that fairly

detracts from that decision." *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)). If the Court reviews the record and finds that two positions are possible based on the evidence, the Court must affirm the ALJ. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

## IV. FACTS

### A. Moschke's Educational and Employment Background

Moschke was born in 1967. He graduated from high school in 1986 and served in the United States Army from 1994-1999, until he was honorably discharged. Currently, he is enrolled in his third year as a full time student at Hawkeye Community College, studying Automated Systems Technology. At the ALJ hearing, Moschke testified that he receives all of his schoolbooks on audio, in addition to other accommodations, due to his disorder of written expression and dyslexia.

Moschke worked as a welder in the Army, a skill which he learned after graduating from high school. Following his discharge, he was employed from 2000-2006 by Triton Boat Company, L.P. in Tennessee. His earnings at Triton ranged from $24,476 to $27,259 each year. In 2006, Moschke ceased working at Triton and moved back to Iowa. In 2007, he recorded $90 in earnings. He has no recorded earnings from 2008 through the present.

### B. Administrative Hearing Testimony

### 1. Craig Moschke's Testimony

At the administrative hearing, the ALJ asked Moschke why he is unable to pursue full time employment, noting that he had worked full time for a number of years in the past. Moschke replied:

> I have a hard time retaining what I'm working on . . . walking into work and doing maintenance, walking around in the building, the pain in my knees and ankles was getting too much, that I had a hard time dealing with work.

4

(Administrative Record at 43-44.)  Moschke also noted that he had problems with his coworkers, who thought he was "odd."[1]  However, when pressed for specific details on his inability to work, Moschke did not elaborate.

### 2.    *Vocational Expert Testimony*

The ALJ posed two hypothetical questions to the vocational expert, Marian S. Jacobs.  The first hypothetical was for an individual who:

> is limited to light work [and] has additional limitations as follows: should never climb ropes, ladders, or scaffolds on the job; only occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, or crawl; should avoid concentrated exposure to extreme cold and to hazards such as moving machinery and unguarded heights; should not have to drive on the job; should not have to read instructions or write reports on the job; can use a computer, however.  The person is able to do work involving only simple work-related decisions, with few workplace changes.  The person can be around coworkers, but with only occasional conversations, interpersonal interaction, et cetera.  And there should be no work with the public.

(Administrative Record at 57-58.)   The vocational expert testified that given these limitations, Moschke would not be able to perform his past relevant work.  However, she also testified that Moschke would be able to perform the jobs of document preparer (1,500 positions in Iowa and 142,000 nationwide), laundry folder (450 positions in Iowa and 35,000 nationwide), or housekeeping cleaner (4,000 in Iowa and 338,000 nationwide).[2]

The ALJ posed a second hypothetical where, in addition to the limitations identified in the first hypothetical, the person is also limited to sedentary work.  The vocational expert opined that such an individual would still be able to perform the work of document preparer.  The ALJ then clarified the hypothetical to include persons who can read and

---

[1]  Administrative Record at 45.

[2]  Administrative Record at 59.

write, but could not prepare lengthy reports.  The vocational expert identified the additional job of final assembler of optical frames (850 positions in Iowa and 60,000 nationwide).[3]

### C.  Moschke's Medical History

Moschke's relevant medical history regarding his joint pain, sleep apnea, and cognitive disorders began in 2006.  On October 2, 2006, Moschke met with Dr. Adrian Burton to discuss feelings of depression.  Dr. Burton noted that Moschke was going through a tough divorce and dealing with custody issues.  He also noted that Moschke planned to start his own welding business in Iowa, since he had quit his welding job in Tennessee.

Moschke was diagnosed with "significant sleep apnea syndrome with significant oxygen desaturation" and took part in an overnight sleep study in the Neurology Sleep Disorders Laboratory in November of 2006.[4]  Pursuant to this diagnosis, Moschke was provided with a CPAP machine to treat his sleep apnea.  However, during his follow-up appointment, Moschke claimed that despite using the CPAP machine every night, he was still not getting adequate sleep due to painful joints and a possible deviated septum.

On January 3, 2007, Moschke met with Dr. Laura Calderwood, a psychiatrist, to discuss his depression.  Dr. Calderwood's notes indicate that Moschke's depressive symptoms were most likely the result of his ongoing divorce and custody issues, in addition to the recent death of his father.[5]  In Moschke's history of present illness, Dr. Calderwood stated:

> It sounds like he started to have problems when he split up
> from his wife.  He says that she had been cheating on him.
> She was abusive.  The history is not totally clear to me.  He

---

[3] Administrative Record at 62-63.

[4] Administrative Record at 381-382.

[5] Administrative Record at 407

> was here with his girlfriend.  He quit his job in Tennessee and moved back to Iowa to stay with his parents.  He hasn't been able to find work . . .  He is concerned that he will be put in jail for not paying child support.  He has not been able to pay it since he stopped working.

Administrative Record at 407.  Dr. Calderwood noted that Moschke's symptoms of depression included poor concentration, sleep problems, no appetite, low energy, hopeless feeling, irritation, sad mood, anhedonia, and passive suicide ideation.  She prescribed an antidepressant for Moschke to take on a trial basis, although she did not diagnose him with a depressive disorder.  Dr. Calderwood also noted that Moschke rated his knee and ankle pain a 5 on a scale from 1-10.

On January 24, 2007, Moschke was examined by Dr. Blair Thornhill, M.D., at the University of Iowa Veterans Hospital and diagnosed with sleep apnea and tenderness in the knees and ankles.  Dr. Thornhill requested x-rays of both ankles and knees.  The x-rays of Moschke's knees resulted in the following: "[t]he joint spaces are unremarkable.  No significant osteophyte formation identified.  No joint effusion or hematoma identified.  No fractures, periosteal reaction, osteolytic or osteoblastic lesions are identified."[6]  The overall diagnosis was normal.  The x-rays of his ankles found: "[b]oth ankles have anatomic alignment.  No fractures, periosteal reaction, osteolytic or osteoblastic lesions are identified.  No significant soft tissue swelling identified.  Calcaneal spurring identified bilaterally."  The overall impression was normal.

Moschke met with Dr. Calderwood again on February 9, 2007.  She reported that he spoke about a number of issues, including his recent trip to Tennessee to deal with divorce proceedings and custody issues.  She noted that he was "trying very hard to find a job.  He has some difficulties because he does have knee problems."[7]  Moschke's relevant mental state appeared to be "[s]omewhat disheveled, appears clean, good eye

---

[6] Administrative record at 390.

[7] Administrative Record at 484.

contact, pleasant.  Mood was just a little bit agitated or anxious and affect was appropriate . . . somewhat circumstantial and tangential.  It's obvious that he's worrying about a lot of issues."[8]

On February 20, 2007, Moschke was examined by Dr. Christina Ward in the orthopedic department who noted that if Moschke "tries to run for more than 5 minutes, both ankles swell.  He has a hard time getting down on his knees because of pain in his ankles.  Also notes intermittent popping from knees when squatting, sometimes painful."[9] At the time of this examination, Moschke was taking Buproprion for depression, Diclofenac for ankle pain, Flunisolide for nasal congestion, and Misprostol to protect his stomach.  Dr. Ward found moderate tenderness in both ankles, with a possible slight osteophyte in his left ankle.  The examination of his knees was normal.  Dr. Ward also noted that Moschke was upset with his prior care because he had been told "it was all in his head."[10]  He was provided with cushioned insoles and lace up ankle braces to help alleviate his ankle pain.

On March 2, Moschke spoke on the phone with Heather Hollandsworth, R.N. regarding his progress while taking the Buproprion.  Overall, he appeared to be doing well and Ms. Hollandsworth noted that Moschke stated he felt calmer and better able to focus, in addition to getting along better with others.  Ms. Hollandsworth's notes also state:

> One thing that is noted is that he seemed some what grandious *[sic]* while talking about his skills and future plans.  He reports that he is the best wleder *[sic]* in iowa *[sic]* althrough *[sic]* Tennessee.  He refuses to work for a company because he feels he is to *[sic]* good for them and would do better going into his own business.  He list *[sic]* a number of future goals and plans that he would liek *[sic]* to accomplish in the near

---

[8] Administrative Record at 485.

[9] Administrative Record at 402.

[10] Administrative Record at 402-403.

> future.  Pt reports he can not take a sit down job because he
> jsut *[sic]* cannot sit there,  he has to be doing various things.

Administrative Record at 619-620.

On March 7, 2007, Moschke had a consultation in the otolaryngology department regarding his nasal obstruction.  He was diagnosed with bilateral nasal obstruction and bilateral post-auricular cysts.  Following this diagnosis, Moschke underwent outpatient surgery for a septoplasty and post-auricular cyst excision on March 29, 2007.  After his surgery, Moschke reported feeling great improvement in his ability to breathe through his nose on both sides.

Prior to his surgery, Moschke met again with Dr. Calderwood on March 26, 2007. Her notes indicate that Moschke was coping better with his stressors.  He relayed that he had been sleeping better since using the CPAP machine and that he was looking forward to his nasal surgery.  Dr. Calderwood's other findings include Moschke's mood and general affect were good and that he was logical, talkative, and that his psychomotor activity "is on the high side of what I would consider normal."[11]

Moschke began meeting with  Dr. Miriam Meyer, Ph.D., for psychotherapy appointments on May 11, 2007, with a follow-up session on May 23.  Moschke's presenting problems were listed as needing up-to-date assessments for school accomodations and help in dealing with his sister.  Dr. Meyer spoke with Moschke about possible treatments for anxiety and his cognitive disorder.  The treatment goals were defined as completing a PTSD evaluation and improving Moschke's ability to cope with his father's role in past sexual abuse trauma.

On May 23, 2007, Dr. Deborah Gideon, a neuropsychologist, examined Moschke for learning disabilities so that he could receive accommodations for his college courses. Dr. Gideon noted that during their appointment, Moschke presented himself as "reasonably groomed, appropriately dressed man. . . .  Speech was rapid, meaningful, coherent and

---

[11] Administrative Record at 453.

adequately articulated but disorganized. . . . He was cooperative, friendly, and open in his responses. He exerted good effort on tasks and was motivated to perform well."[12] Moschke completed several tests during the examinations, the results of which were mixed findings of average intelligence, with above average capabilities in some areas and below average in others. Dr. Gideon's recommendations noted academic assistance with "reading, spelling, and other cognitive problems, especially those in memory, is essential for this pt. to be able to complete usual academic coursework."[13] She also noted that a career in machine maintenance, Moschke's chosen field, would be appropriate considering his abilities. Dr. Gideon recommended that Moschke continue individual psychotherapy to help with his anger management, "foster appropriate behavioral choices," and help treat his mood disorder.[14]

At a follow-up session on June 19, 2007, Dr. Gideon reported that Moschke was making "good efforts to compensate for his learning difficulties in his coursework while being aware and accepting of his limitations. . . . He will continue to need assistive devices such as tape recorders and PDA to help him benefit maximally from psychotherapy sessions and class lectures."[15] On the same date, Moschke completed a follow-up visit with the Dr. Craig Lyon, an orthopedist, regarding his ankle pain. Dr. Lyon found minimal issues with Moschke's ankles and declined to prescribe narcotics for the pain. He advised Moschke to continue wearing his ankle braces.

On June 27, 2007, Moschke met with Dr. Calderwood. He was in a good mood and reported doing well in school. She noted, "It sounds like he was good at welding but

---

[12] Administrative Record at 698.

[13] Administrative Record at 700.

[14] Administrative Record at 734.

[15] Administrative Record at 725.

he is not physically able to stay on his feet all day long anymore."[16]   Moschke reported that he had been offered a good welding job in Tennessee, but that he did not want to go back to Tennessee because of the heat.

Moschke had a follow-up appointment with Dr. Thornhill on July 20, 2007. Records indicate that Moschke's ankle pain was stable and he would continue treating his pain with Tramodol, Diclofenac, and Misprotol.   Additionally, his sleep apnea had improved with the use of the CPAP machine.

Moschke had a six month follow-up with Jeaneatte Peirce, L.P.N., to discuss his ankle pain.   Peirce's records indicate that despite pain medication, Moschke's ankles still bothered him.   He requested to be tested for neuropathy.   Peirce instructed Moschke to continue taking his pain medication and to call if his pain became intolderable.

Moschke met with Dr. Meyer again on August 6, 2007.   Her notes indicate that although Moschke had problems with depression when he first moved to Iowa, he felt that things were now more positive.   He earned a 4.0 grade point average and felt that the accommodations he received were helpful.   Moschke met with Dr. Meyer a third time on September 24, 2007 to assess whether he suffered from depression.   Dr. Meyer ruled out depression and discussed a treatment plan for the future.   On December 18, 2007, at an appointment with Dr. Meyer, Moschke stated he was having a more difficult semester at school than he had the past summer and that he needed a letter for child support recovery stating that he was unable to work.   Dr. Meyer and Moschke agreed he probably did not need psychotherapy and that in the future he could meet with a social worker to discuss subsequent issues.

Moschke spoke with Erin McCandless, L.M.S.W., on January 2, 2008 regarding his finances and living situation.   He was contacted by McCandless at the request of

---

[16] Administrative Record at 722.

Dr. Meyer regarding psychosocial stressors.  Moschke mentioned that he was having difficulty making his child support payments and was not working because of his full time enrollment in school.

On February 1, 2008, Moschke had an appointment with Dr. Calderwood.  Her records indicate that he was stressed about not being able to make his $100 per month child support payments, due to being enrolled in school full time and unable to work as a result. Dr. Calderwood noted that Moschke was unlikely to be able to handle a desk job and that Moschke was gathering statements from doctors about his inability to work.

X-rays of Moschke's knees taken on February 12, 2008 revealed minimal osteophytes in the left knee with minimal degenerative changes in the right knee, resulting in a diagnosis of Grade 1 osteoarthritis in the right knee and Grade 2 osteoarthritis in the left knee.  Ankle x-rays showed minimal osteophytes in the left and right ankles with mild Achilles and plantar traction spurs in the calcaneus.  Dr. Andrew Malin, M.D., reported that surgical treatment was unlikely to benefit Moschke, but that he should continue using ankle braces.

On April 2, 2008, Moschke was evaluated by Dr. Thornhill for tungsten poisoning, rheumatoid arthritis and a neuropathy check.  Dr. Thornhill found no tungsten in Moschke's symptoms and ordered an EMG to test for neuropathy.  The results of the EMG and NCV studies were normal and found no evidence for neuropathy, myopathy, nor radiculopathy.  Moschke was re-examined by an orthopedic doctor, Dr. Ryan Ilgenfritz, who recommended continued use of ankle braces, but noted that surgery would not benefit Moschke.

On April 15, 2008, Moschke underwent an examination by Robert Welshons, PA-C, for a disability determination.  Mr. Welshons' examination revealed normal range of motion in the knees and ankles, but with decreased dorsiflexion and plantar flexion in the left ankle.  Mr. Welshons noted that Moschke would have trouble with standing and walking for extended periods, but could tolerate a position with more sitting.  Additionally,

Moschke would have troubles with reading or writing, "but he can process information in other ways."[17] Mr. Welshons stated that Moschke "is not going to be able to tolerate any of the physical types of jobs he has had up until now, but he should be able to tolerate a different work environment. The patient notes that he has been told in the past that he should get a desk job but he feels he is not able to do this with the reading and writing problems that he has. However, school is a type of desk work and he is doing that with accommodations."[18]

On February 11, 2009, Moschke sprained his ankle. He visited the emergency room and was provided with crutches and told to treat the ankle with rest, ice, compression, and elevation. Moschke proceeded to call doctors several times over the following weeks, stating that the pain was not receding and that he would like an MRI to check for tendon damage.

On February 27, 2009, Moschke visited the emergency room, stating that he could not wait until his next appointment due to his knee and ankle pain. His girlfriend, Nancy Gibson, accompanied him and brought a document she wrote in support of her theory that Moschke has Asperger's syndrome. The doctor found no evidence of acute fractures or dislocation and diagnosed Moschke with chronic knee and ankle pain, recommending that he continue taking his pain medication.

Moschke called Sondra Reglein, an R.N. and mental health case manager, on March 12, 2009, and requested that he meet with Dr. Calderwood to be tested for Asperger's syndrome. Dr. Calderwood reviewed his chart and stated that Moschke does not meet the criteria for that diagnosis. Gibson then called Reglein claiming that Moschke did not understand. Reglein's notes state the Moschke seemed very able to comprehend the conversation. On March 27, 2009, Moschke called again and spoke with Reglein,

---

[17] Administrative Record at 781-82.

[18] Administrative Record at 781.

requesting that he be tested.  When questioned about why he thought he should be evaluated, he stated, "because the VA doctors can't understand me, I was in so much pain and they did not understand me."[19]  He also desired additional help in school, which Reglein reminded him he already receives.  Following this conversation, Reglein notified Dr. Kevin Quinn, M.D., that Moschke's chart had been reviewed by the psychiatry, psychology, and neuropsychology departments in Waterloo and Iowa City, all of whom concluded that he does not qualify for a diagnosis of Asperger's syndrome.

On April 6, 2009, Moschke was examined by Dr. Quinn for knee pain, ankle pain, and sleep apnea.  Dr. Quinn recommended that Moschke be examined by a neurologist for his pain.  He also noted that Moschke was being pushed in a wheelchair by his girlfriend, finding it "a little odd that the 41-year-old gentleman was being wheeled around in a wheelchair because he had ankle pain."[20]

On April 20, 2009, Gibson visited a psychiatric clinic to arrange for an appointment to evaluate Moschke for Asperger's syndrome.  The report notes that "Nancy Gibson is determined to have the patient diagnosed with Asperger's."[21]  An appointment was scheduled with Dr. Calderwood for May 29, 2009.

Moschke met with Dr. Paul Conditt, Psy.D., on May 4, 2009 for a psychiatric diagnostic examination.  Dr. Conditt noted that Moschke's girlfriend's doctor suggested that Moschke may have Asperger's and that is why they visited him.  Dr. Conditt found Moschke to have moderate memory impairment with a mild degree of conceptual disorganization.  His attitude was suspicious and guarded and he demonstrated a poor attention span.  Dr. Conditt diagnosed Moschke with Asperger's during this visit.

---

[19] Administrative Record at 951.

[20] Administrative Record at 946.

[21] Administrative Record at 941.

Following the appointment, Dr. Conditt wrote a letter to two of Moschke's healthcare providers explaining the diagnosis of Asperger's.

On May 11, 2009, Dr. Lynn Rankin examined Moschke regarding his knee and ankle pain. The report notes that Moschke and Gibson had many questions about disability, vocational rehabilitation, and compensation. Dr. Rankin's findings were similar to other doctors' regarding Moschke's knee and ankle pain, noting that neuropathy did not appear to be the cause of his pain.

Dr. Calderwood examined Moschke on May 29, 2009 to address his, and Gibson's, concerns about Asperger's. Her records note that Moschke was examined seven times by a psychologist and five times by her, in addition to undergoing extensive neuropathy testing, and nothing in his history suggests he has Asperger's. Dr. Calderwood told Moschke that she would not diagnose him with Asperger's and also sent a note to Gibson informing her of that decision. They discussed Moschke's chronic ankle pain problems, as he was frustrated with his doctors regarding treatment.

Dr. Joseph Doro examined Moschke on November 18, 2010, and determined that the source of his cognitive complaints was not neurological. Dr. Doro stated that due to Moschke's altered processing "which goes along with Asperger's disorder and this combined with his learning disorder and the PTSD secondary to the significant stressful events in his life, I do not feel he will ever be gainfully employed."[22]

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Moschke is not disabled. In reaching its determination, the ALJ conducted a five-step evaluation, as required by the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). In determining whether an individual has a disability, the ALJ must consider the following five steps: (1) whether the claimant is engaged in substantial gainful

---

[22] Administrative Record at 1100.

activity; (2) the medical severity of the claimant's impairments; (3) whether the impairment or combination of impairments meets or equals an impairment listed in the Code of Federal Regulations; (4) whether the claimant can perform his or her past relevant work; (5) whether the claimant is capable of adjusting to other existing work opportunities. 20 C.F.R. § 404.1520(a)(4)(i)-(v). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled. . . ." *Goff*, 421 F.3d at 790 (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)).

In order to establish a disability claim, "[t]he claimant bears the burden of demonstrating an inability to return to her past relevant work." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pates-Fire v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (internal citations omitted)). If the claimant successfully carries its burden, the burden then shifts to the Commissioner "to show the claimant is capable of performing other work." *Id.*

> At this stage, the ALJ must determine the claimant's residual functional capacity (RFC), that is, what she can still do physically even with her impairments, and also the claimant's age, education, and relevant work experience – the latter three findings being referred to as vocational factors, as opposed to RFC, which is a medical factor.

*Id.* (quoting *Reed v. Sullivan*, 988 F.2d 812, 815-16 (8th Cir. 1993)). Following the determination of the claimant's RFC, the Commissioner "must then prove . . . that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790 (quoting *Eichelberger*, 390 F.3d at 590) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). If at any step in this process, the claimant fails to meet the stated criteria, "the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91.

At step one of the analysis, the ALJ determined that Moschke had not engaged in any substantial gainful activity since March 15, 2007. Applying step two, the ALJ found

that Moschke had the following severe impairments: osteoarthritis of the knees and ankles, bilaterally; obesity; cognitive disorder; reading disorder, math disorder, and disorder of written expression; and mood disorder.  The impairments were deemed severe because they "result in functional limitations which limit the claimant to performing less than a full range of sedentary unskilled work."[23]   The ALJ also noted that Moschke suffers from sleep apnea, but it has been treated with surgical repair and the use of a CPAP machine and is therefore well controlled and not severe.  At the third step of the analysis, the ALJ found that none of Moschke's impairments met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Applying the fourth step, the ALJ determined Moschke's RFC:

> [Moschke] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except: he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he can occasionally balance, stoop, kneel, crouch, and crawl.  He should avoid concentrated exposure to extreme cold and to hazards, such as moving machinery and unguarded heights.  Additionally, the claimant can do work involving only simple work-related decisions with few workplace changes.  While he can read and write on the job, he should not be required to write lengthy reports.  Further, he should have no contact with the public; and he can be around coworkers but should have only occasional conversations/interpersonal interaction with them.

Administrative Record at 16.  The ALJ noted that Moschke had performed past relevant work as a heavy equipment mechanic and welder, but his current RFC only qualified him for unskilled work, therefore he cannot perform any of his past relevant work.  At the fifth step, the ALJ found that Moschke's RFC allowed him to perform work that exists in significant numbers in the national economy, specifically, the positions of document preparer (DOT Number 249.587-018) and final assembler of optical frames (DOT Number 209.587).  Therefore, the ALJ ruled that Moschke was not disabled.

---

[23] Administrative Record at 13.

### B.  Objections Raised By Claimant

Moschke claims the ALJ committed four errors.  First, he argues the ALJ failed to give sufficient weight to the opinions of Dr. Conditt and Dr. Fuelling.  Moschke then claims the ALJ relied on the vocational expert's response to an incomplete hypothetical question, thus erring as a matter of law.  Moschke also argues the ALJ erred in evaluating the extent of his symptoms. Finally, Moschke argues the ALJ should have found the evidence overwhelmingly supports a finding of disability.

### 1.    The Opinions of Dr. Conditt and Dr. Fuelling

Moschke's first claim is that the ALJ failed to give sufficient weight to the opinions of Dr. Conditt and Dr. Fuelling.  Dr. Conditt, a psychologist, examined Moschke once and diagnosed him with Asperger's Disorder.  Dr. Fuelling is a chiropractor who treated Moschke several times and submitted a letter to the ALJ regarding Moschke's physical condition.

### a.    Dr. Conditt's Opinion

Moschke argues that the ALJ should not have discounted Dr. Conditt's medical diagnosis of Asperger's when determining whether his impairments met a listing in the Appendix.  Furthermore, he argues that even if the ALJ was justified in ignoring Dr. Conditt's opinion for that purpose, the ALJ should have considered Dr. Conditt's other findings, apart from the diagnosis of Asperger's, when determining Moschke's RFC. Moschke supports this position by noting that two physicians, Dr. Doro and Dr. Edwards, examined Moschke after the ALJ hearing and accepted Dr. Conditt's diagnosis of Asperger's.  Moschke argues this evidence was submitted to the Appeals Council and should therefore be grounds for remanding the case to determine whether Moschke has Asperger's and whether that qualifies as a listed impairment.

In response, the Commissioner argues that "the ALJ rejected Dr. Conditt's diagnosis of Asperger's Syndrome because it was inconsistent with the opinions of Dr. Calderwood and Dr. Gideon, 'who had ongoing treatment relationships with the

[plaintiff].'"[24]   Furthermore, the Commissioner claims the ALJ properly excluded Dr. Conditt's findings when determining Moschke's RFC because those findings stemmed from his initial diagnosis of Asperger's.   The ALJ also considered the context of Dr. Conditt's evaluation of Moschke, which was for the primary purpose of obtaining evidence in support of his disability claim, rather than for treatment purposes.

The ALJ is required to consider every medical opinion when determining whether a claimant is disabled.   20 C.F.R. § 404.1527(b).   In determining how much weight a medical opinion from a treating source warrants, the ALJ will consider the length of the treatment relationship, the frequency of examinations, supporting evidence, consistency with the record as a whole, and the area of specialization involved.   20 C.F.R. § 404.1527(c).   "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence. . . .'"   *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff*, 421 F.3d. at 790, in turn quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).   Where there are disagreements among medical professionals, it is the role of the ALJ to resolve those conflicts in accordance with the medical record as a whole.   *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).

In examining the medical evidence and record as a whole, the ALJ properly considered and excluded Dr. Conditt's opinion.   As noted by the ALJ,

> Dr. Conditt saw the claimant only one time for some 50 minutes.   At the time the claimant presented for this evaluation, he had been evaluated multiple times by treating mental health professionals who had ongoing treatment relationships with the claimant, and who specifically told him that he did not have Asperger's.   Dr. Conditt's diagnosis conflicts with the diagnoses of the claimant's treating psychiatrist and treating psychologist, who have consistently and often stated that the claimant does not have Asperger's,

---

[24] Defendant's Brief (docket number 13) at 25.

> but rather has a cognitive disorder not otherwise specified and
> a reading disability.

Administrative Record at 14.   The ALJ continued, "the claimant underwent the examination that formed the basis of the opinion in questions not in an attempt to seek treatment for symptoms, but rather, in connection with an effort to generate evidence for the current appeal."[25]

The Court finds the ALJ properly considered and weighed the medical opinion of Dr. Conditt. The ALJ discussed Dr. Conditt's findings in her decision and compared them to the treating medical professionals who had an ongoing relationship with the claimant. It is within the purview of the ALJ to decide how much weight to afford a medical opinion when it conflicts with other medical opinions. *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009). Additionally, even if a different conclusion could be drawn regarding this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Wildman*, 596 F.3d at 964.

Moschke argues the Appeals Council should have reversed or remanded the case based on the medical opinions of Dr. Doro and Dr. Edwards, who accepted Dr. Conditt's diagnosis of Asperger's. Both doctors examined Moschke following the ALJ hearing, so their evidence was not considered in that decision.

> If new and material evidence is submitted, the Appeals Council
> shall consider the additional evidence only where it relates to
> the period on or before the date of the administrative law judge
> hearing decision. The Appeals Council shall evaluate the entire
> record including the new and material evidence submitted if it
> relates to the period on or before the date of the administrative
> law judge hearing decision.

20 C.F.R. § 404.970(b).   Thus, "the Appeals Council *must* consider evidence submitted with a request for review if it is '(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'"  *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th

---

[25] Administrative Record at 14.

Cir. 2000) (quoting *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995), in turn quoting *Williams v. Sullivan*, 905 F.2d 214, 216–17 (8th Cir. 1990)).  In order for evidence to be considered "new," it must be "more than merely cumulative of other evidence in the record."  *Bergmann*, 207 F.3d at 1069.

> If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b).  Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion.  In these circumstances, we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination. *See Nelson*, 966 F.2d at 366.

*Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000).

The evidence Moschke submitted to the Appeals Council was not material, nor did it detract from the ALJ's conclusion.  The opinions of Dr. Doro and Dr. Edwards restate Dr. Conditt's diagnosis of Asperger's, but neither report indicates they have re-examined him or provided further diagnosis or treatment for that syndrome.  Dr. Doro is a neurologist who examined Moschke to determine the basis of his cognitive issues. Dr. Doro's report states: "In view of the altered processing that he exhibits which goes along with Asperger's disorder and this combined with his learning disorder and the PTSD secondary to the significant stressful events in his life, I do not feel he will ever be gainfully employed."[26]  This report, while providing Dr. Doro's opinion of Moschke's condition, does not detract from the ALJ's decision.  There is nothing to suggest that Moschke's condition is different from what was presented to the ALJ.   Similarly, Dr. Edwards' letter merely re-states the evidence already contained in the administrative record.  Dr. Edwards also appears to rely on Dr. Conditt's diagnosis of Asperger's, although he began a treatment relationship in June 2010 (but does not indicate how many

---

[26] Administrative Record at 1100.

times he has examined Moschke, only that he has been a client since that time). Therefore, having considered the new evidence as part of the entire administrative record submitted to the Appeals Council, the Court finds the ALJ's decision with regard to the opinions of Dr. Conditt is supported by the record as a whole.

### b.    Dr. Fuelling's Opinion

Moschke's chiropractor, Dr. Fuelling, submitted a letter to the ALJ explaining Moschke's knee and ankle pain, and the effects it has on his body.  Moschke argues the ALJ erred in failing to afford the statement any weight or considering them in her conclusion.  In turn, the Commissioner argues that because Dr. Fuelling's status as a chiropractor does not qualify him as an "acceptable medical source," his evidence falls under "other medical evidence," giving the ALJ much discretion in applying such evidence.  The letter written by Dr. Fuelling describes Moschke's condition thusly:

> Mr. Moschke has had several injuries to his ankles, some of which have been serious.  These injuries have deteriorated over the past several years, leading to a noticeable change in his gait to accommodate the pain.  This change in his gait has, in turn caused spinal problems and pain in his hips and lower back. . . .  In recent months the condition of his ankles has deteriorated and forced him to use crutches. . . .  I anticipate continued and possibly worsening problems with his back and lumbosacral region if the condition of his ankles persists or deteriorates.

Administrative Record at 887.

"An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001).  Nothing in Dr. Fuelling's letter contradicts the findings of Moschke's treating physicians, whose opinions were accepted by the ALJ in its ruling.  Dr. Fuelling's letter states additional symptoms, but so far as it conflicts with the treating physicians' opinions, the ALJ was justified in disregarding it.

###### 2.  *Incomplete Hypothetical Question*

Moschke next argues the ALJ erred as a matter of law by relying on the vocational expert's answer to an incomplete hypothetical question.  Specifically, Moschke alleges that the third hypothetical question posed to the vocational expert "did not completely or precisely describe his physical or mental impairments."[27]  Moschke claims the ALJ's finding that he could walk or stand occasionally, as required by even sedentary work, is not supported by substantial evidence on the record as a whole.  Moschke also argues the ALJ erroneously excluded his obesity and related sleep apnea from the hypothetical question, in addition to inadequately accounting for his mental impairments.

A hypothetical question posed to a vocational expert is sufficient "if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001); *see also Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) ("Because the ALJ's hypothetical posed to the VE contained all of the concrete consequences of Robson's physical deficiencies during the relevant time period, we conclude that there is substantial evidence on the record as a whole to support the ALJ's finding that Robson could perform a sedentary job.").

The hypothetical question posed to the vocational expert and adopted by the ALJ in her decision sufficiently described Moschke's symptoms.  The vocational expert testified that a claimant who is unable to stand or walk for two hours in an eight hour workday, who can perform some reading and writing, and is limited to only occasional interactions with coworkers would be qualified to perform sedentary, unskilled work.[28]  The ALJ's decision adopted the vocational expert's recommendation and added the following restrictions:

---

[27] Plaintiff's Brief and Argument (docket number 10) at 23.

[28] Administrative Record at 58-63.

he can never climb ladders, ropes or scaffolds; he can occasionally climb ramps and stairs; he can occasionally balance, stoop, kneel, crouch, and crawl. He should avoid concentrated exposure to extreme cold and to hazards, such as moving machinery and unguarded heights. Additionally, claimant can do work involving only simple work-related decisions with few workplace changes. While he can read and write on the job, he should not be required to write lengthy reports. Further, he should have no contact with the public; and he can be around coworkers but should have only occasional conversations/interpersonal interaction with them.

Administrative Record at 16.

Moschke's objection that the ALJ did not address his obesity and sleep apnea is without merit. The ALJ noted in her decision that Moschke's obesity is a severe impairment, but that his sleep apnea has been well controlled through medical treatment and is therefore not severe.[29] As far as Moschke's obesity is concerned, the ALJ considered his knee and ankle pain in her recommendation, an exacerbating source of which is his obesity. There is nothing in the record to suggest that Moschke has additional limitations due to his obesity. The Court finds, therefore, the hypothetical questions posed to the vocational expert and adopted by the ALJ included those impairments that were substantially supported by the record. *Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004).

### 3.  *ALJ's Evaluation of Moschke's Symptoms*

Moschke argues the ALJ failed to properly evaluate his subjective allegations regarding the intensity and persistence of his symptoms. Specifically, Moschke claims his daily activities and treatment history are consistent with his disability claims. He also claims the ALJ understated the severity of his mental impairments. The Commissioner argues that the ALJ properly considered all of Moschke's complaints and is supported in her findings by the record on the whole.

---

[29] Administrative Record at 14.

It is the duty of the ALJ to assess a claimant's subjective allegations. *Eichelberger*, 390 F.3d at 589-90. When assessing a claimant's credibility,

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "In evaluating a claimant's subjective complaints of pain, the 'absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered.'" *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (quoting *Polaski*, 739 F.2d at 1322). "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)). So long as the ALJ provides its reasons for discounting such allegations, however, the Court will uphold its determination. *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001); see also *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) ("We will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain . . .); *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993); *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995).

In reaching her decision, the ALJ determined:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. The claimant's description of the severity of the pain to his own doctors has been so extreme as to appear implausible to the medical providers. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. He is going to college full-time and told his doctor that he could not both work and go to school. Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature for both his physical and mental impairments. As for his mental impairments, he worked with them for years and there is no allegation nor evidence of any exacerbating incident/accident; this suggests these impairments would not preclude substantial gainful activity now. There is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments, ie., to avoid paying court-ordered child support, to help care for his elderly parents, and to attend college.
>
> In view of the claimant's ankle and knee pain, quite possibly exacerbated by his obesity, the undersigned finds it reasonable to limit him to sedentary work, with some additional postural and environmental limitations. In consideration of the claimant's mental impairments, the undersigned has assessed quite restrictive social functioning limitations, as well as limitations accounting for his cognitive difficulties and limitations in concentration. In fact, giving the claimant the benefit of the doubt, the undersigned has assigned much more restrictive limitations than the claimant's demonstrated working capabilities. For example, the claimant's past relevant work was skilled (Exhibit 32E), yet the residual functional capacity above is for unskilled work. The evidence

does not show the claimant is more restricted than the residual
functional capacity above.

Administrative Record at 19.

The ALJ's determination shows that she considered all aspects of Moschke's daily activities, duration and intensity of pain, aggravating factors, treatment, and other extraneous factors when evaluating his credibility. The ALJ, therefore, adequately evaluated the record and considered the *Polaski* factors in issuing her ruling. *Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered."); *Partee v. Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) ("The ALJ is 'not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints.") (internal quotation omitted). Because the ALJ considered Moschke's subjective compaints, but discredited them based on the evidence within the record, the Court upholds the ALJ's determination. *Eichelberger*, 390 F.3d at 590.

## VI. CONCLUSION

The Court finds the ALJ properly considered and weighed the medical evidence and opinions in the record, including the opinions of Dr. Conditt. The ALJ's hypothetical questions posed to the vocational expert sufficiently described Moschke's impairments as supported by the record. Finally, the ALJ properly examined Moschke's credibility with regard to his subjective allegations of disability. Therefore, the Court determines the ALJ's decision is supported by substantial evidence on the record as a whole and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.      The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.      Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3.     The Clerk of Court is directed to enter judgment accordingly.

DATED this ___3rd___ day of August, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA